541 A.2d 347

**COMMONWEALTH of Pennsylvania**

v.

**Roland MARKUM, John O'Brien, Howard Walton, Susan Silcox Kathy Long, Ellen Jones, and Anne Marie Breen, Appellants.**

**COMMONWEALTH of Pennsylvania**

v.

**Henry TENAGLIO and Joseph Wall, Appellants.**

**COMMONWEALTH of Pennsylvania**

v.

**Walter GIES, Appellant.**

Superior Court of Pennsylvania.

Argued June 25, 1987.

Filed May 2, 1988.

Samuel C. Stretton, West Chester, for appellants.

Donna G. Zucker, Assistant District Attorney, Philadelphia, for Com., appellee.

Before CIRILLO, President Judge, and McEWEN and TAMILIA, JJ.

CIRILLO, President Judge:

Appellants take this appeal from a judgment of sentence of one day to three months imprisonment imposed by the Honorable John J. Poserina of the Court of Common Pleas of Philadelphia County following their conviction for defiant trespass.[1] We affirm.

On August 10, 1985, as part of an anti-abortion demonstration, appellants pushed their way into the Northeast Women's Center on Roosevelt Boulevard in Philadelphia, and occupied several rooms there. Once inside, they damaged two aspirator machines and other medical instruments, threw equipment out of a third floor window, and placed "pro-life" stickers on the doors, walls, and ceilings. Appellants refused to leave, even after several requests by the Center's staff, and were ultimately removed when police arrived and carried them from the scene.

Appellants appeared for trial before the Honorable Mitchell S. Lipschutz of the Philadelphia Municipal Court, and were found guilty. All appellants except Tenaglio and Wall proceeded to a *de novo* trial before Judge Poserina.

During a hearing on a motion in limine, appellants made an offer of proof in support of their claim that they be allowed to present a defense of justification. Following the submission of briefs and argument on March 24, 1986, Judge Poserina ruled that justification did not lie. Judge Poserina certified the question of justification for interlocutory appeal, but this court denied appellants' petition and remanded the case for trial.

On September 30, 1986, the jury returned guilty verdicts as to all appellants. On October 20, 1986, Judge Poserina

1. These appeals were consolidated by orders dated December 29, 1986, and January 27, 1987.

found the remaining appellants, Tenaglio and Wall, guilty after they stipulated to the testimony presented at the jury trial of their co-defendants.

Following sentencing, the appellants were immediately paroled on the condition that they each perform fifty hours of community service, not to be served in any pro-life agencies, and refrain from trespassing on medical facilities that perform abortions. Post-trial motions were filed and denied and this timely appeal followed.

Appellants raise one issue on appeal: whether the trial judge erred in not allowing appellants to present the defense of justification to the jury.

In Pennsylvania, the defense of justification is grounded in statute. 18 Pa.C.S. §§ 501–10. This legislation has several provisions. However, it must be noted that appellants failed to specify which justification provision they deemed applicable to their case. In *Commonwealth v. Capitolo*, 508 Pa. 372, 381–382, 498 A.2d 806, 810–811 (1985), our supreme court held that a litigant must specify which section of the justification statute their claim is based upon. In *Capitolo*, the appellants proceeded under § 503; therefore, the court held that any claim under § 510 was waived. Here, where appellants only nebulously claimed justification, without specifically invoking either §§ 503 or 510, their claim may have been waived altogether. However, inasmuch as appellants asserted the defense at trial, in post trial motions, and again on appeal, we will consider the issue to be properly preserved and presented.

Section 503 states:

(a) General rule.—Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(b) Choice of evils.—When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

Section 510 states:

Conduct involving the appropriation, seizure or destruction of, damage to, intrusion or interference with property is justifiable under circumstances which would establish a defense of privilege in a civil action based thereon, unless:

(1) this title or the law defining the offense deals with the specific situation involved; or

(2) a legislative purpose to exclude the justification claimed otherwise plainly appears.

The Pennsylvania Supreme Court, in *Commonwealth v. Capitolo*, 508 Pa. 372, 498 A.2d 806 (1985), and *Commonwealth v. Berrigan*, 509 Pa. 118, 501 A.2d 226 (1985), addressed the applicability of the justification provisions of §§ 503 and 510, respectively.

In *Capitolo*, Patricia Capitolo and four others crept under a fence enclosing the Shippingsport Nuclear Power Plant. Once through, they sat down about ten to twelve feet inside of the fence and held hands. They were placed under arrest after refusing requests of plant representatives that they leave the premises. The five sought to present a justification defense under § 503, the general justification provision of the statute, but were refused by the trial judge because they would not have been able to prove that their trespass was justified. They were subsequently convicted

of trespass in the Court of Common Pleas of Beaver County.

On appeal, a majority of this court reversed the decision of the trial court, concluding that appellants' offer of proof met the requirements of § 503 and that they should have been able to present to the jury evidence in support of the defense.

Our supreme court reversed and reinstated the convictions, holding that the defense of justification is available only when the appellee is able to make an offer of proof which establishes:

(1) that the actor was faced with a clear and imminent harm, not one which is debatable or speculative;

(2) that the actor could reasonably expect that the actor's actions would be effective in avoiding this greater harm;

(3) there was no legal alternative which will be effective in abating the harm; *and*

(4) the Legislature had not acted to preclude the defense by a clear and deliberate choice regarding the matter at issue.

*Capitolo*, 508 Pa. at 378, 498 A.2d at 809 (emphasis ours). The court went even further in stating that

it is essential that the offer meet a minimum standard as to each element of the defense so that if a jury finds it to be true, it would support the affirmative defense—here that of necessity.... Where the proferred evidence supporting one element of the defense is insufficient to sustain the defense, even if believed, the trial court has the right to deny use of the defense and not burden the jury with testimony supporting other elements of the defense.

*Id.*

After applying these basic principles to the facts of the trespass action, the court concluded that the danger at the nuclear plant was not imminent and that the appellees "could not establish that their criminal conduct was necessary to avoid harm or evil to themselves or others." *Id.*

In *Berrigan*, the Berrigan brothers and six others entered the General Electric plant in King of Prussia, Pennsylvania, where they damaged hydrogen bomb missile components and poured human blood on the premises. Property damage exceeded $28,000. The eight involved were charged and convicted of burglary, criminal mischief, and criminal conspiracy. An offer of proof was made under § 510, (the property crimes provision of the justification statute) to present the defense of justification. The trial judge permitted them to offer their own testimony in support of the defense, but refused to permit them to present expert testimony.

On appeal, this court held that appellants should have been able to present the defense, and present expert testimony in support of the defense.

Once again, our supreme court reversed. By applying §§ 196 and 262 of the Restatement of Torts Second to 18 Pa.C.S. § 510, the court concluded that the Restatement imposes upon § 510 the requirements that the actor reasonably believe that the act in question was necessary to avoid an imminent and public disaster. *Berrigan*, 509 Pa. at 123–124, 501 A.2d at 229. The court then reiterated the four-part test used in *Capitolo* and determined that the trial court had properly ruled that the offer of proof was insufficient to establish that the nuclear holocaust that appellees sought to avert was a clear and imminent public disaster.

The court in *Berrigan* went even further, however, and held additionally that the defense of justification was not available "in situations where the conduct some perceive to engender public disaster has been specifically approved of by legislation making it legal conduct ..." *Id.*

 Abortion has been specifically approved by the Pennsylvania Legislature in the Abortion Control Act, which was adopted in January of 1983. 18 Pa.C.S. §§ 3201–3220. Were it not protected by such legislation, the justification defense would continue to remain unavailable because a woman's right to abortion is protected by the Constitution

of the United States. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The *Berrigan* mandate that a justification defense may not be raised if the asserted "harm" is legal is not dependent upon whether such conduct has been made legal through legislative choice or judicial fiat. We live in a society of laws and no individual is entitled to raise himself above the law. We are each bound by the law no matter its source. Were we free to pick and choose which laws we wished to obey, the result would be a society of strife and chaos. Therefore, even if the legislature had not made a clear choice regarding abortion, the justification defense would be unavailable because abortion is lawful by virtue of the United States Constitution. Certainly, justification may not be asserted as a grounds for interference with a person's right to free speech even though that right has not been legislatively approved. Free speech has been constitutionally approved, as has a woman's right to abortion. Democracy allows the citizenry to protest laws of which they disapprove. But they must nonetheless obey such laws or face the legal consequences. To allow the defense of justification to those who willingly and intentionally break the law would encourage criminality cloaked in the guise of conscience.

As the *Capitolo–Berrigan* test makes clear, there must be a threat of an imminent and public disaster. Appellants' offer of proof was insufficient as a matter of law to satisfy this four-part test. The use of justification as a defense could be precluded on this ground alone, regardless of the fact that abortion is legally sanctioned.

Appellants wish to produce testimony to establish that life begins at conception. They wish to show scientifically that a fetus as young as eight weeks of age has measurable brain-wave activity. Because Pennsylvania's Determination of Death Act, 35 Pa.C.S. §§ 10201–10203, provides that death occurs when all brain activity ceases, appellants assert that their evidence would demonstrate that abortion is the taking of a human life, and hence, a "public disaster." They also claim that the disaster was imminent, not specula-

tive, and that their actions were effective in averting the disaster. Finally, they assert that there was no legal alternative for their actions.

Appellants' first argument, that abortion constitutes a public disaster, fails. As we have noted, pre-viability abortion is lawful by virtue of state statute and federal constitutional law. The United States Supreme Court, from *Roe* through its progeny, has consistently held that the state's interest in protecting fetal life does not become compelling, and cannot infringe on a woman's right to choose abortion, until the fetus is viable. *Roe* at 163–164, 93 S.Ct. at 732. Appellants do not suggest that viability and conception are simultaneous occurrences. We find that a legally sanctioned activity cannot be termed a public disaster.

Appellants' second argument, that the disaster was imminent and that their actions were effective in averting it, similarly must fail. It is unreasonable for appellants to believe that their brief occupation of one center would effectively put an end to the practice of abortion. Appellants' occupation of the Women's Center did not stop its operation. Legal abortions continued to be performed in the Center and were available in other medical facilities throughout Pennsylvania.

Appellants' third contention, that there was no legal alternative to their actions, is misguided. As Judge Poserina noted, "[t]here are obviously numerous means in a democratic society to express a point of view or to attempt to prevent a perceived harm without resorting to criminal behavior." Appellants were free to peacefully demonstrate outside of the center in an effort to prevent the harm that they perceived from occurring.

Finally, appellants' offer of proof was insufficient to show that no legislative purpose exists to exclude the justification defense, nor could they, because Pennsylvania law is to the contrary. The Abortion Control Act specifically provides that "[i]n every relevant civil and criminal proceeding in which it is possible to do so *without violating*

*the Federal Constitution,* the common and statutory law of Pennsylvania shall be construed to extend to the unborn the equal protection of the laws...." 18 Pa.C.S. § 3202(c) (emphasis ours). Clearly, to permit private citizens the right to prevent women from exercising their right to abortion would be a violation of both state statute and federal constitutional law.

As in *Berrigan,* appellants in the instant case were trying to halt legal conduct. It has been suggested that the justification defense might lie where appellants can show that the conduct which they attempted to halt was illegal. However, even if illegal conduct could be proven, and appellants' offer of proof contained no allegations that the Northeast Women's Center was engaging in other than legal abortions, the *Capitolo-Berrigan* test would prohibit the use of the defense if there were other legal alternatives for abating the harm. Because the Pennsylvania Abortion Control Act specifically proscribes post-viability abortion (with narrow exceptions), any public disaster that such abortions present can be adequately controlled by law enforcement personnel. *See* 18 Pa.C.S. § 3201(a). Therefore, any claim of justification under § 510 will fail according to the supreme court mandate in *Berrigan.* Appellants cannot use unlawful means in an effort to stop lawful behavior, no matter how morally reprehensible they feel that behavior to be. "[T]respassing on private property ... is not legally justified by philosophical disagreement. [The justification defense] does not condone ... ad hoc self help which forebodes legal chaos." *Capitolo,* 508 Pa. at 381, 498 A.2d at 810.

The appellants are actually requesting that this court countenance civil disobedience, which is defined as:

A form of lawbreaking employed to demonstrate the injustice or unfairness of a particular law and indulged in deliberately to focus attention on the allegedly undesirable law.

Black's Law Dictionary 223 (1st ed. 1979).

Though, our nation has a long and proud history of civil disobedience, appellants are not in that tradition. From the

Boston Tea Party to the abolitionists to conscientious objectors to the sit-ins of Martin Luther King, civil disobedience has often stirred our nation's collective conscience and spurred us to change or repeal unjust laws. Often, juries refused to convict good men of conscience whose love of justice had motivated them to violate the law. On some occasions, a jury would convict but the judge in recognition of the righteousness of the underlying cause would suspend sentence or issue a nominal find. Abortion demonstrators argue that they are in this tradition and should be treated accordingly. They overlook the key distinction between their actions and the behavior of those cited above.

The true conscientious objector refuses to obey the very law which he claims is unjust. Rosa Parks refused to sit in the back of the bus and "draft dodgers" refused to register for the draft. When prosecuted, they challenged the wisdom, morality and constitutionality of the law in question.[2] They did not employ their objections to that law as an excuse to engage in general or targeted violence. But that is what the demonstrators in this case have done. On this appeal, the demonstrators challenge the applicability of our criminal trespass laws to their activities. But they do not assert that those laws are unconstitutional or unjust. Rather they believe that because they disagree with the practice of abortion they are entitled to deface and occupy property belonging to other persons. How sad that their sense of justice and outrage is so narrowly focused.

Judge Poserina correctly determined that the justification defense would not lie. The action sought to be prevented by appellants was lawful, and as such, could not be prevented by unlawful conduct. Furthermore, appellants' offer of proof was insufficient to satisfy the four-part *Capitolo–Berrigan* test for determining when the defense of justifi-

---

2. Of course, some civil disobedience such as the Boston Tea Party or the work of the abolitionists calls into question the very moral authority of the government. Obviously, this is not what the appellants intended as on this appeal they seek the protection of a statutory defense promulgated by our government.

cation will lie. For these reasons, we affirm the judgment of sentence.

McEWEN, J., concurs and dissents.

TAMILIA, J., dissents.

McEWEN, Judge, concurring and dissenting:

Since the rulings of both the United States Supreme Court, in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and the Pennsylvania Supreme Court, in *Commonwealth v. Berrigan*, 509 Pa. 118, 501 A.2d 226 (1985), preclude the presentation by appellants of the defense of justification, I am compelled to join in the ruling of my distinguished colleague, President Judge Vincent A. Cirillo, the author of the lead opinion affirming the judgment of sentence. I write, nonetheless, so as to express the view that appellants have surmounted three of the four obstacles to presentation of the defense—a view which is, of course, measurably different from the conclusion of the lead opinion that appellants failed to meet any of the four requirements.

While the defense of justification has a number of synonyms,[1] it is " 'often expressed in terms of choice of evils: When the pressure of circumstances presents one with a choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser evil.' " *State v. Olsen*, 99 Wis.2d 572, 576, 299 N.W.2d 632, 634 (1980) *quoting La-Fave & Scott*, Criminal Law § 50, at 382 (1972). "Determination of the issues of competing values and, therefore, the availability of the defense of necessity is precluded, how-

1. The general defense of justification is usually thought of as the statutory designation of what had traditionally been termed in the common law as the defense of necessity. It might be said that the term "justification" is somewhat more apt than "necessity"; the latter is somewhat misleading since the term "necessity" reflects the notion that the act of the accused was inevitable and unavoidable rather than the voluntary choice of the actor. The defense of justification is also frequently described by the process of its application, such as "choice of evils", "competing harms", "compulsion", "balancing of harms", "balancing of evils", "balancing of competing values", and "confession and avoidance".

ever, when there has been a deliberate legislative choice as to the values at issue." *State v. Warshow*, 138 Vt. 22, 27, 410 A.2d 1000, 1003 (1979) (Hill, J., concurring).

The U.S. Supreme Court, in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), held that the constitutional right of privacy of a mother is paramount to the right to life of her unborn child during the first trimester of pregnancy. Thus, this nation's highest court balanced the competing interest of the mother in terminating her pregnancy against the right to life of the infant, and held that the right of the mother to terminate her pregnancy during the first trimester is paramount to the right to life of the infant. Our state legislature, in response to *Roe v. Wade, supra*, enacted the Pennsylvania Abortion Control Act, 18 Pa.C.S. §§ 3201–3220, which authorizes first trimester abortions such as those scheduled for August 10, 1985, at the Northeast Women's Center. The appellants have not asserted that any of the pregnancies scheduled for abortion were beyond the first trimester. *See:* 18 Pa.C.S. § 3209.

The Pennsylvania Supreme Court directly addressed the protestors' reliance upon the defense of justification and decreed in *Berrigan* that "the defense of justification will lie only where the actor offers evidence that will demonstrate:

(1) that the actor was faced with a public disaster that was clear and imminent, not debatable or speculative;

(2) that the actor could reasonably expect that the actions taken would be effective in avoiding the immediate public disaster;

(3) that there is no legal alternative which will be effective in abating the immediate public disaster;

(4) that no legislative purpose exists to exclude the justification from the particular situation faced by the actor."

*Id.* 509 Pa. at 124, 501 A.2d at 229.

Thus, an accused who wishes to present evidence in support of the defense of justification must make an offer of proof as to each one of the four specific elements of the defense, namely, efficacy, imminency, lack of legal alterna-

tive, and absence of a legislative purpose to exclude the defense. It follows, of course, that the trial court is obliged to preclude any effort to rely upon the defense even if but one of the four elements cannot be demonstrated.

The disaster which appellants sought to prevent was the abortions that would be completed in a very brief time after the women entered the building. While it is to be conceded that a certain number of the women entering the building sought but information, a significant number of women were entering the clinic to effect an abortion. The danger perceived by appellants was, therefore, clear and imminent. Further, were appellants able to prevent the women from entering into the building, their action would have been quite effective in thwarting the immediate disaster appellants perceived as awaiting the women and their unborn children in the clinic. And, of course, appellants had no legal alternative available. Therefore, I conclude that appellants complied with three of the conditions precedent to presentation of the defense of justification.

It is the fourth and final element that impedes the presentation of the defense of justification by the appellants. The fourth condition prescribed by the Pennsylvania Supreme Court in *Commonwealth v. Berrigan, supra,* 509 Pa. at 124, 501 A.2d at 229, required appellants to establish that "no legislative purpose exists to exclude the justification from the particular situation faced by the actor." The Pennsylvania Abortion Control Act, 18 Pa.C.S. §§ 3201 *et seq.,* enacted as a consequence of the *Roe v. Wade* decision of the United States Supreme Court, evinced the intention of the Pennsylvania Legislature to exclude the defense of justification in the situation confronting appellants. Thus, the appellants here did not—in fact, could not—establish the absence of a legislative purpose to exclude the defense of justification.

My eminent colleague, Judge Patrick R. Tamilia, provides an insightful rationale based upon his view that "the Supreme Court, in fixing viability at a point supported by medical knowledge as it existed at *that time* [1973], ... has

left open the question of when the state may intervene, to be dependent upon medical evidence as to viability...." I differ with that interpretation and, in support of my view, note that those who abhor the ruling do so because, contrary to the dissent, the United States Supreme Court held in firm and certain fashion that the right of the mother to terminate her pregnancy during the first trimester is paramount to the right to life of that infant. On the other hand, the rationale of Judge Tamilia is no less a plea and one in which I fervently join, namely, that the United States Supreme Court, in response to accepted medical knowledge, enhanced by the technological improvements occurring during the fifteen years since the evidence was assembled for presentation to the Court in *Roe v. Wade*, proceed in urgent fashion to reject as outmoded the evidence of viability relied upon in *Roe v. Wade*.

Nonetheless, I am constrained to concur in the affirmance of the judgment of sentence.

TAMILIA, Judge, dissenting:

I follow and support the reasoning of the majority in its analysis of the justification defense to the point where it holds that justification defense in abortion is precluded by legislative and constitutional protection. Abortion Control Act, 18 Pa.C.S. §§ 3201–3220. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Abortion is constitutionally protected but it is a qualified protection. *Roe, supra.* The significant distinction between this case and *Commonwealth v. Capitola*, 508 Pa. 372, 498 A.2d 806 (1985) and *Commonwealth v. Berrigan*, 509 Pa. 118, 501 A.2d 226 (1985) is that there was no imminent danger in constructing atomic warheads. Abortion stands on an entirely different footing. I believe the defense is available in two respects despite statutory and constitutional limitations. First, if the clinic was processing abortions beyond the time of viability, as established by *Roe*, the right to protect the life of a fetus in those circumstances would exist within the present legislative and constitutional pa-

rameters. While the appellants would base their defense on proof that life begins at conception and that there are measurable brain waves in a fetus as young as eight weeks of age, the Supreme Court in *Roe*, having established the right to intervene by the state *only* at the point of viability, their argument as to life beginning as determined by brain wave activity is irrelevant. However, the Supreme Court, in fixing viability at a point supported by medical knowledge as it existed at *that* time, in my opinion has left open the question of when the state may intervene, to be dependent on medical evidence as to viability at the time at issue. *Roe v. Wade* was promulgated in 1973. In the intervening years, enormous strides have been made in sustaining life of fetuses outside the womb, who, at the time of *Roe*, were considered nonviable. In *Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the majority summarized the holding in *Roe* and subsequent abortion decisions as follows:

> First, a State has an "important and legitimate interest in protecting the potentiality of human life." [*Roe*] [410 U.S.] at 162, 35 L Ed 2d 147, 93 S Ct 705 [at 731]. Although the interest exists "throughout the course of the woman's pregnancy," *Beal v. Doe*, 432 US 438, 446, 53 L Ed 2d 464, 97 S Ct 2366 [2371] (1977), it becomes compelling only at viability, the point at which the fetus "has the capability of meaningful life outside the mother's womb," *Roe*, supra, at 163, 35 L Ed 2d 147, 93 S Ct 705 [at 732]. See *Planned Parenthood of Central Missouri v. Danforth*, 428 US 52, 63–65, 49 L Ed 2d 788, 96 S Ct 2831 [2838–39] (1976). At viability this interest in protecting the potential life of the unborn child is so important that the State may proscribe abortions altogether, "except when it is necessary to preserve the life or health of the mother." *Roe*, 410 US, at 164, 35 L Ed 2d 147, 93 S Ct 705 [at 732].

*Id.* at 428, 76 L.Ed.2d 702, 103 S.Ct. at 2492.

The dissent, authored by Justice O'Connor, joined by Justices White and Rehnquist, carried the concept of flexi-

bility as to viability beyond that discussed in the majority. The dissent stated:

Just as improvements in medical technology inevitably will move *forward* the point at which the State may regulate for reasons of maternal health, different technological improvements will move *backward* the point of viability at which the State may proscribe abortions except when necessary to preserve the life and health of the mother.

In 1973, viability before 28 weeks was considered unusual. The 14th edition of L. Hellman & J. Pritchard, Williams Obstetrics (1971), on which the Court relied in Roe for its understanding of viability, stated, at 493, that "[a]ttainment of a [fetal] weight of 1,000 g [or a fetal age of approximately 28 weeks gestation] is ... widely used as the criterion of viability." However, recent studies have demonstrated increasingly earlier fetal viability. It is certainly reasonable to believe that fetal viability in the first trimester of pregnancy may be possible in the not too distant future. Indeed, the Court has explicitly acknowledged that Roe left the point of viability "flexible for anticipated advancements in medical skill." *Colautti v. Franklin*, 439 US 379, 387, 58 L Ed 2d 596, 99 S Ct 675 [681] (1979). "[W]e recognized in Roe that viability was a matter of medical judgment, skill, and technical ability, and we preserved the flexibility of the term." *Danforth*, supra, [428 U.S.] at 64, 49 L Ed 2d 788, 96 S Ct 2831 [at 2838].

The Roe framework, then, is clearly on a collision course with itself. As the medical risks of various abortion procedures decrease, the point at which the State may regulate for reasons of maternal health is moved further forward to actual childbirth. As medical science becomes better able to provide for the separate existence of the fetus, the point of viability is moved further back toward conception. Moreover, it is clear that the trimester approach violates the fundamental aspiration of judicial decisionmaking [sic] through the application of neutral principles "sufficiently absolute to give them roots

throughout the community and continuity over significant periods of time...." A. Cox, The Role of the Supreme Court in American Government 114 (1976). The Roe framework is inherently tied to the state of medical technology that exists whenever particular litigation ensues. Although legislatures are better suited to make the necessary factual judgments in this area, the Court's framework forces legislatures, as a matter of constitutional law, to speculate about what constitutes "accepted medical practice" at any given time. Without the necessary expertise or ability, courts must then pretend to act as science review boards and examine those legislative judgments.

*Id.* at 456–58, 76 L.Ed.2d at 720–21, 103 S.Ct. at 2506–07.

The significance of these holdings is that *Roe* was considered in 1973. *Akron* was argued in 1982, and we now have the case sub judice under consideration in 1988. In the 15 intervening years it is acknowledged that viability has been reduced to below 24 weeks, as opposed to 28 weeks under *Roe*. While there is no break in the underlying position that viability of the fetus determines when the state interest may be invoked on its behalf, as opposed to conception, the standards applied in *Roe* are no longer applicable for that determination.

This is the point at which I depart from the majority. Even assuming that a defense of justification based upon conception as put forth by appellant is fruitless because of holdings of *Roe* and legislative enactments such as the Abortion Control Act, that defense may still be available to late-term abortions as to viability. Since the majority wisely ignored waiver for failure to specify the justification defense under either sections 503 or 510, we may consider that defense as it applies to the entire spectrum of fetal life where viability is implicated. As Justice O'Connor stated in her *Akron* dissent, "It is certainly reasonable to believe that fetal viability in the first trimester of pregnancy may be possible in the not too distant future. Indeed the Court has explicitly acknowledged that *Roe* left the point of

viability 'flexible for anticipated advancements in medical skills'." Citations omitted. *Id.* at 457, 76 L.Ed.2d at 720–21, 103 S.Ct. at 2507.

If viability has significantly been advanced and abortion services continue to apply the 1973 *Roe* standards, then a state interest in protecting fetal life is likely implicated in some cases. Fetal life is, therefore, protected in those instances and the defense of justification would be available to persons attempting to protect or save a fetus capable of surviving under the advanced medical standards. Unquestionably, clinics and hospitals can and do establish standards and controls to assure that no abortions are performed except in cases in which the fetus could not be viable under advanced medical technology. This may not, however, be presumed in the face of an offer of proof on the defense of justification.

This case, therefore, cannot be decided on the law promulgated under *Capitola* and *Berrigan, supra.* There, the danger to life was not imminent and there were no specific individuals who could be identified as being in danger nor could the actions of the protesters be effective in avoiding the greater harm.

In this case, the appellants conceivably could have produced evidence that viability had significantly advanced from the 28 weeks' criterion of *Roe,* that a viable fetus, who would survive under the advanced medical technology available, would be terminated and that the actions of the appellants would be effective in avoiding the greater harm as the fetus in that class would have been aborted before legal action would be taken. It is also clear that no legal alternative would have been effective in abating the harm. Thus the denial of the right to pursue the justification defense precluded the appellants from attempting to establish the proof of viability and the inherent right to protect life under the circumstances of this case.

It is acknowledged that this will be a difficult task and the proof may not be forthcoming, despite the offer. However, by rejecting the offer out of hand as to proof of

conception, appellants were also precluded from pursuing proof of earlier viability than recognized by the clinic under *Roe*.

It must be left for another day and to a higher court to pass on the right to intervene under the justification defense as it relates to conception. As of now, this Court, as an intermediate appellate court, is powerless to do so.

I would vacate the judgment of sentence and grant a new trial to permit the appellants the opportunity to invoke the justification defense in respect to the viability standard utilized by the clinic and the likelihood that viable fetuses might be aborted.