OPINION OF THE COURT
John Manning Regan, J.
I. FACTS
On Saturday morning, May 21, 1988, at 7:00 A.M., Timothy *392 Archer, Gerald Crawford and 40 others entered Highland Hospital in Rochester, New York, and went at once to the fifth floor, east wing. Upon arrival at that location, all 42 persons sat down in the hallway which led to the examining, and clinical treatment, rooms where nine abortions were scheduled to be performed that day. The group sang hymns, greeted the women who came for abortions, and distributed pro-life literature to them. The Highland Obstetrical Group, a partnership of six physicians, had leased that floor of the east wing of the hospital, for the purpose of performing these abortions, and two members of the partnership, Doctors Wax and Eisenberg, were present that morning, and were anticipating attending to their patients. Around 7:30 A.M., the director of security for Highland Hospital notified police of this abortion "sit-in”. When the police came, in response to his summons, they found that the 42 people had physically blocked access to the clinic and that no abortions were in progress. Over a period lasting about five hours, the police tried to evacuate these protestors with persuasion, admonition, threats and warnings. These measures having failed, the police resorted, finally, to arrests. They managed to clear the area, and to take all 42 people into custody, about 1:00 p.m. that afternoon.
This episode was free from overt violence to either person or property. The charges which the hospital and the police have filed against the 42 defendants are criminal trespass, third degree,[1] and resisting arrest.[2]
U. PRETRIAL PROCEEDINGS
In August 1988, after the arraignment of all 42 defendants, and during the pretrial discovery stage, the People moved, on written application, to preclude the defendants from asserting the "necessity defense” at the trial. At that point in the prosecution of these cases, however, the defendants had not offered any evidence whatsoever in the case, nor had they any duty to do so.
The necessity defense, authorized in New York by statute,[3] is a subordinate classification within the broader justification defenses set out in article 35 of the Penal Law.
In subdivision (2) of section 35.05 of the Penal Law, the *393 opening phrase limits the defense of justification generally to cases where the otherwise admittedly criminal conduct of a defendant is "necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor”, and where the injury sought to be avoided clearly outweighs the injury the criminal statutes in question were calculated to prevent. Moreover, at the close of the subdivision, the following sentence appears: "Whenever evidence relating to the defense of justification under this subdivision is offered by the defendant, the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a defense.” (See, Penal Law § 35.05 [2]; emphasis added.)
Interpreting and applying that final sentence of the statute to the People’s preclusion motion made during pretrial proceedings in August, this court held that the People’s application was obviously premature because the defendants had not yet "offered evidence relating to the defense of justification” which is a statutory precondition to any preclusion order from a trial court.[4] Accordingly, the court, at that time, denied the People’s motion, without prejudice, and determined to reconsider it only when the defendants had offered evidence relating to the justification defense.
in. TRIAL
The trial of these 42 defendants began November 15, 1988. The People have called about 20 witnesses — mostly police officers — who have testified to the "sit-in” on May 21st on the fifth floor of the hospital, and to the fact that all the defendants resisted arrest because they refused to stand and walk to the "paddy-wagon”, and, consequently, the police had to carry them, bodily, or in wheelchairs, to transport vehicles. The court and jury have also seen a videotape of the event filmed live during the "sit-in”.
The evidence so far — particularly the videotape — will support the inferences that the defendants trespassed on hospital *394 premises, and passively resisted their removal from the fifth-floor abortion clinic in order to "rescue” the unborn children whom the Highland Obstetrical Group had scheduled for abortions that morning.[5] Further, the evidence for the defendants thus far, offered in cross-examination of the police officers, in their opening address to the jury, and through several of their witnesses in their direct case, strongly suggested that they intend to argue to the jury that the injury they sought to avoid — the abortion of the unborn children— clearly outweighs the injury they allegedly committed — i.e., criminal trespass and resisting arrest.
It is, therefore, at this point, in the midst of the trial, after presentation of the People’s case, and during the direct case of the defendants, and prior to submission of the case to the jury for deliberation and verdict, that the statute commands a trial court to rule, as a matter of law, whether these claimed facts and circumstances would, if established, constitute a defense.
Accordingly, the People’s motion is now timely, and ripe for decision.
For the reasons which follow, the court denies the motion to preclude the defense of justification, and rules that, as a matter of law, if the claimed facts and circumstances are established, they will constitute a justification defense to the charges of criminal trespass and resisting arrest.

1. Defense of Justification (Necessity Doctrine)

Whether justification is a defense to admittedly criminal behavior when the injury sought to be avoided is the abortion of unborn children is a question of first impression in New York. Our justification statute — mirroring the Model Penal Code which was its genesis — concerns itself primarily with the justifiable use of physical force in self-defense situations, or in situations where the protection of other persons or property from the imminent threat of direct injury or loss by third parties is the issue. New York has, however, enacted the justification defense generally for all criminal offenses under the Penal Law, "whenever the facts and circumstances of a criminal case force a choice between the lesser of two evils”.[6] *395 a. The New York Statutory Scheme of Justification as a Defense
New York’s statutory defense of justification originated in 1965. Assemblyman Richard J. Bartlett, Chairman of the Commission on Revision of the Penal Code, submitted the first preliminary draft of the proposed Revised Penal Code to the Legislature in 1964. This draft had derived from a principal reference source: the American Law Institute’s proposed Model Penal Code.[7] Between the 1964 and 1965 legislative sessions, however, the entire preliminary draft underwent substantial changes, particularly with respect to the justification defense.
To understand the evolutionary process from principal reference source to statute, the various text of the justification defense, from its earliest draft, to final passage are set out at this point:
(1) Model Penal Code
(Tentative Draft No. 8)
"3.02 Justification Generally: Choice of Evils.
"(1) Conduct which the actor believes to be necessary to avoid an evil to himself or to another is justifiable, provided that:
"(a) the evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
"(b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
"(c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
"(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of evils or in appraising the necessity for his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.”
(2) Proposed Revised Penal Law (1964)
"§ 65.00 Justification generally
*396 "Unless inconsistent with the ensuing provisions of this article defining justifiable use of physical force, or with some other provision of law, conduct which would otherwise constitute an offense is justifiable and not criminal when * * *
"2. Such conduct is necessary to avoid a public or private injury or evil greater than that sought to be prevented by the law defining the offense charged. The injury or evil sought to be avoided must arise from a situation occasioned by or developed through no fault of the actor and must, according to ordinary standards of intelligence and morality, clearly outweigh the injury or evil sought to be prevented by the law defining the offense charged. It must not be founded upon considerations pertaining only to the morality or advisability of the law.”
(3) Penal Law
"§ 35.05 Justification; generally
"Unless otherwise limited by the ensuing provisions of this article defining justifiable use of physical force, conduct which would otherwise constitute an offense is justifiable and not criminal when * * *
"2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. Whenever evidence relating to the defense of justification under this subdivision is offered by the defendant, the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a defense.”
The Model Penal Code’s 8th Tentative Draft contains the most extensive explanation of its justification defense entitled: "choice of evils”. Under the second and third limiting paragraphs (§3.02 [1] [b], [c]), which eliminate the necessity defense whenever the Legislature has specifically spoken on the topic, the commentators explicitly refer to the example of therapeutic abortion as an illustration of the necessity defense *397 at common law. Their example cites an earlier English penal statute which simply prohibited all "unlawful pregnancy terminations”; and points to the case of Rex v Bourne ([1939] 1 KB 687, [1938] 3 All ER 615), which, despite the statute, allowed a pregnancy termination because, in that case, it was a therapeutic abortion (to preserve the life or health of the mother). The decision employed the common-law necessity defense as a bar to successful prosecution under the statute.
By contrast, the commentators further advised that a more specific statute on abortion — one, for example, that enumerated which pregnancy terminations were legal, and which were not, would preempt the defense of justification entirely since "the legislature has itself canvassed and determined what the choice shall be” and "[u]nder the Code, [the Legislature] is always free to do so and to have its choice prevail.” Under the Model Code whatever was legal, therefore, could not be evil. The Model Code, in other words, precluded the necessity defense whenever the Legislature had legalized conduct.[8]
But what this court must observe here is that both the revisors of the New York Penal Law, and the Legislature itself, rejected this limiting language in the Model Code, and adopted, instead, a different standard. They wrote that the "injury * * * to be avoided must * * * according to ordinary standards of intelligence and morality * * * clearly outweigh the injury” the criminal law(s) in question were designed to prevent. (Penal Law § 35.05 [2]; emphasis added.) The revisors, therefore, deliberately chose to enlarge the categories of possible evils to include not simply illegal behavior, but any injury which existed "according to ordinary standards of intelligence and morality.” In other words, despite the legality of behavior, that behavior could still constitute an "evil” or "injury” to be avoided, so long as, according to ordinary standards of intelligence and morality, it could reasonably be classified as such.[9]
What is obvious here is that both the Legislature and the revisors have recognized, in the New York Penal Law, a different standard of judgment for determining what is an *398 "injury to be avoided”, which standard is broader, and more encompassing, than the legal/illegal classifications within the Penal Law itself. Granted what is criminally illegal is, ipso facto, an injury to be avoided. But the contrary of that proposition — namely, "what is legal is therefore not an injury to be avoided” does not follow. In the former case, behavior which is criminally forbidden always violates "ordinary standards of intelligence and morality”. But in the latter case, behavior which is permissively legal does not always comport with ordinary standards of intelligence and morality.
In Nevada, for example, prostitution is legal, but still immoral.[10] Some type of gambling is almost everywhere legal, but many persons of ordinary intelligence and morality still consider it immoral. Traffic in alcohol beverages is legal, but its by-product, drunkenness, remains immoral. Divorce is legal, but, in many cases, it is immoral, especially when it affects innocent children of the marriage. Thus the two ideas —morality and legality — are not the same. Morality is the standard of conduct to which, as good and decent people, we all aspire. Legality is the standard of conduct to which, as members of a civilized society, and under penalty of the criminal sanction, we must all adhere.
The question then, for this court is whether, under this statutory test of "ordinary standards of intelligence and morality” a jury may find that these nine abortions could have been an "injury to be avoided”.
b. Abortion as "Injury to be Avoided”.
(1) Legality v Morality of Abortion— NY Statutes
Abortion is still a crime under the New York Penal Law.[11] Ironically (inasmuch as we are discussing the justification defense), the Legislature, in 1970, created the category of a "Justifiable abortional act”. That categorization became the method whereby any therapeutic abortion, and any abortion performed with consent within 24 weeks from the commence *399 ment of pregnancy, was absolved from criminal responsibility.[12]
This classification of a "Justifiable abortional act” became effective July 1, 1970.[13] It antedated the Roe v Wade (410 US 113) decision of the United States Supreme Court by more than 30 months. One of the principal sponsors of this 1970 legislation, Assemblywoman Constance E. Cook of Ithaca, characterized this amendment, in the memorandum urging its passage, as follows: "The legislation is permissive. It would force no one to live under its dictates or to live in a moral or religious environment foreign to his upbringing or training”. (See, 1970 NY Legis Ann, at 242.)
This carefully crafted 1970 amendment to the penal abortion laws, therefore, was not authored to establish the morality of abortion. To the contrary, it was intended to alleviate a perceived social crisis of pernicious illegal abortions which were causing death and injury to hundreds of thousands of child-bearing women every year. As Assemblywoman Cook said in her memorandum, "illegal abortions are the single largest cause of maternal death” and "hundreds of thousands of illegal abortions are done each year”; yet "virtually no deaths result when an abortion is conducted in accordance with proper medical procedures”. (See, 1970 NY Legis Ann, at 240.)
Her portrayals of the legislative purpose behind the 1970 amendment illuminate the complex social panorama that both surrounded and spawned the passage of these laws. In effect, because the Legislature could not stop illegal abortions, they capitulated to the social reality of it, rather than intensify the enforcement of the then current law. Instead of ameliorating the rigors of the old therapeutic abortion laws, the Legislature leaped from an extreme position at one end of the spectrum, to an equally extreme position at the opposite end. For the "Justifiable abortional act” legislation of 1970 did more than modify prior law, it totally eviscerated the criminal sanction^) for abortion, and replaced a policy of "therapeutic abortion only” with a policy of "abortion on demand”.
But, at least, there was no hypocrisy about the morality of what the Legislature did. In characterizing the legislation *400 in terms of justifiability, and permissiveness, the lawmakers admitted that they were, in fact, making their own choice among evils. They were admitting that the State was willing to suffer the deplorable social consequences of legalizing abortion rather than the deplorable social consequences of perpetuating illegal abortions. This was an admission of impotency in the face of convincing proof that the then current abortion laws were unable to stem the tide of women resorting to illegal abortion as a remedy for an unwanted pregnancy.
The statutory history of the 1970 amendment is devoid of any hint or suggestion of a moral good to be achieved by legalizing abortion. The supporters all expressed compassion for the loss of maternal lives through illegal abortions and accepted the exigency of legalizing abortion to obviate this social scourge. A statutory history of this kind is not the equivalent of declaring a change in moral values. Tolerance is not approval, although the line between the two is not always easy to find.
In. any event, if this change in the law did not propose to compel a citizen "to live in a moral or religious environment foreign to his upbringing”, then that citizen remained free to adopt moral values in accordance with "ordinary standards of intelligence and morality”, rather than in accordance with the tolerances of the Penal Law. Since that is so, abortion can still constitute a moral "injury to be avoided”, under section 35.05 of the Penal Law, because citizens of ordinary intelligence and morality remain free both as individuals and as jurors, to find it so notwithstanding the fact that the Legislature has made most abortions "justifiable” in relation to what would otherwise be a prohibited criminal act.
Moreover, from the evidence in this trial, the practice of abortion on demand has at this time — 18 years after the 1970 amendment — far transcended the narrow social evil of maternal deaths due to illegal and unsanitary abortion techniques. Abortion has become simply another birth-control device, or a way to overcome a social inconvenience, or an expedient remedy for conceiving a child of the "wrong” sex. These consequences of "justifying” the abortional act were not envisioned in any of the legislative history behind the 1970 amendment, and it is fair comment to say that these unforeseen and unfortunate circumstances can easily be thought of as "injuries to be avoided” according to ordinary standards of intelligence and morality.
*401 For these reasons, the court concludes that, despite the 1970 amendment, which made the abortion of a fetus 24 weeks or younger a "Justifiable abortional act”, a jury of private citizens is free to decide, under section 35.05 of the Penal Law, that many of those abortions are immoral "injuries to be avoided” and that "the urgency of avoiding such injuries clearly outweighs the desirability of avoiding injuries such as Trespassing and Resisting Arrest” which the criminal statutes in issue here are designed to prevent. The jury may weigh the loss of the life of the developing fetus against the property rights the trespass statute protects, and the social order values the arrest statute supports. And if the jury finds that the value of these fetal lives clearly outweighs the competing values of private property and social order, then the court shall instruct the jury, under section 35.05 of the Penal Law, that they may acquit the defendants.[14]
(2) Legality v Morality of Abortion; the Constitutional Issue of Roe v Wade
The codification of the justification defense, and the New York Legislature’s adoption of a statutory definition of what comprises "injuries to be avoided” has created a legal framework which allows our courts and juries to decide that abortion, although legal, and whenever performed, can still constitute an "injury to be avoided”. There can be no gainsaying that this legal framework, however indirectly, is subject to the criticism that it is a form of State statutory regulation of abortion.
In Roe v Wade (410 US 113, 163 [1973], supra) the Supreme Court stated:
"With respect to the State’s important and legitimate interest in the health of the mother, the 'compelling’ point * * * is at the end of the first trimester.”
"[P]rior to this 'compelling’ point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the *402 patient’s pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State. ”
"With respect to the State’s important and legitmate interest in potential life, the 'compelling’ point is at viability.” (Emphasis added).
Roe v Wade (supra) is an absolute constitutional bar to all State regulation of abortion prior to the "compelling points” outlined above. Roe says that there can be no State regulation of abortion prior to the end of the first trimester, for any reason whatsoever.
Succinctly put, the question for this court, at this point, is: In view of the holding in Roe (supra), can section 35.05 of the Penal Law be interpreted to allow a jury to find that a first trimester abortion is an "injury to be avoided” which injury may then outweigh the injuries certain of our criminal laws were designed to prevent? Or, is such a finding an indirect form of State regulation of the abortion decision during the first trimester?
The argument for the defendants is that section 35.05 does not actively encourage human behavior of any kind. It stands only as a guideline to define the legal consequences of human behavior after it has happened. The behavior itself is the private action of individuals, not State action under the 14th Amendment. (See, Flagg Bros. v Brooks, 436 US 149 [1978].) Thus, the action of these individual defendants in trespassing in order to prevent first trimester abortions, and the defense of justification the State statute affords them are not forms of forbidden State action under the principles of Roe v Wade (supra).
The argument for the People is that the justification statute (Penal Law § 35.05) creates a necessity defense which would otherwise not be available to a lawbreaker when it permits a jury to find that a first trimester abortion is an "injury to be avoided”. Without that canopy of legal protection, the trespassing demonstrator is subject to criminal and civil liabilities. Moreover, since the decision in Roe v Wade (supra) forbids any State interference with first trimester abortions, the performance of such abortions is more than merely legal, it is a constitutionally protected right of privacy. (See, Roe v Wade, 410 US, supra, at 163.) Since section 35.05 of the Penal Law would, if so interpreted, interfere with that privacy because it *403 would protect and defend intentional interruption of the private abortion decision, the statute would then indirectly regulate the private exercise of abortion rights, during the first trimester, in violation of the 14th Amendment.[15]
Is there a difference between State action, which is merely passive sufferance, and State action which is constitutionally infirm? The decisions of the Supreme Court have distinguished the two.
In Shelley v Kraemer (334 US 1 [1948]), the constitutional right to purchase and own real property free from racial discrimination was vindicated under the 14th Amendment when the Supreme Court nullified a State court enforcement of racially restrictive real property covenants.
But in Flagg Bros. v Brooks (supra), the State’s tolerance in the form of a refusal to interfere with strictly private behavior — the seizure of one’s own property without notice to the holder — did not become State action under the 14th Amendment.
While the question is by no means free from doubt, there appears to be a body of judicial authority that requires courts to vindicate, in affirmative fashion, constitutionally protected rights of privacy and equality as contrasted with similarly protected due process property rights. For this reason the court holds that the decision of Roe v Wade (supra), making the first trimester abortion a constitutionally protected right of privacy, constrains the court to instruct the jury that section 35.05 cannot classify first trimester abortions as "injuries to be avoided” because neither the statute, nor the court, nor the jury itself, can intrude upon that constitutionally protected area of privacy. Accordingly, Roe prohibits the State statutory necessity defense whenever there are intentional interruptions which interfere with the performance of first trimester abortions.
(3) Abortion as "Injury to be Avoided” Decisions in Other States
This court is aware that decisions in other States have rejected the necessity defense entirely in abortion cases where *404 trespassing is the primary charge.[16] These cases are, however, interpreting State statutes which have, in most cases, enacted the identical language of the Model Penal Code; language which the New York State Legislature did not adopt. Almost all of these cases hold the view that the decision of the Supreme Court in Roe v Wade (supra) has foreclosed any question of whether a jury can find that abortion is an evil or injury to be avoided, because Roe has made abortions legal, and that is that.
Commonwealth v Markum[17] is typical. Applying the Model Penal Code’s version of justification almost verbatim, the majority of that court declares: "Appellants cannot use unlawful means in an effort to stop lawful behavior, no matter how morally reprehensible they feel that behavior to be.” (See, 373 Pa Super 341, 541 A2d 347, 351.)
But, unlike the Pennsylvania statute, moral reprehensibility of lawful behavior can be a factor under section 35.05 of the New York Penal Law because our Legislature expanded the concept of "injury to be avoided” to include any conduct which was morally reprehensible according to "ordinary standards of intelligence and morality.”
Thus, in cases of moral indignation, the flexibility of the New York statute avoids the chafing attrition of the eternal struggle between what is legal and what is moral. The statute allows a jury to ventilate its displeasure at morally reprehensible conduct regardless of its legality by approving, in a verdict of not guilty, the behavior of those who try, even illegally, to prevent that conduct from happening.
Accordingly, the court will instruct the jury that the defendants can present and argue the defense of necessity so long as the jury finds that the Highland Obstetrical Group was *405 about to perform other than first trimester abortions on May 21,1988.
EPILOGUE
Under the foregoing instructions, and upon proof from Drs. Eisenberg and Wax that the nine abortions scheduled on May 21st were all during the first trimester, the jury found the 42 defendants guilty of simple trespass and resisting arrest.

. Penal Law § 140.10, a class B misdemeanor.

. Penal Law § 205.30, a class A misdemeanor.

. Penal Law art 35, Defense of Justification § 35.05.

. [1] CPL 260.30, 350.10 (3) (b); 360.05 all require the prosection to make its evidentiary case before a defendant has any obligation or opportunity to submit proof. This court has considered defining the word "evidence” in this statute (Penal Law § 35.05) to include a plea, or affidavits on a motion, prior to trial. But such a construction would distort its ordinary meaning and would frustrate the plain intent of the Legislature.

. The videotape’s soundtrack contains many statements by these defendants to the arresting officers that the purpose of their demonstration is to save the lives of unborn children.

. In section 3.02 of that Model Code, the justification defense appeared *395 under the heading "choice of evils”. (Compare, People v Padgett, 60 NY2d 142 [1983]; People v Goetz, 68 NY2d 96 [1986].)

. See, 1965 NY Legis Ann, at 51, 52. See also, 1964 Proposed Penal Law § 65.00, Staff Comments, at 317.

. See, Model Penal Code, Tentative Draft No. 8, § 3.02, commentary.

. Moreover the Legislature also deleted from the preamble paragraph the revisors had submitted the phrases: "Unless inconsistent * * * with some other provision of law”. (1964 Proposed Penal Law §65.00.) This meant that even if the defendants’ behavior was inconsistent with other provisions of New York law, the justification defense was, nonetheless, still available to him.

. Nevada Revised Statutes § 269.175 allows the County Commissioner to license houses of prostitution in any unincorporated town within the county. But Nevada Revised Statutes § 244.345 (8) prohibits licensing of a house of prostitution in any county having a population of 250,000 or more.

. See, Penal Law art 125, §§ 125.40, 125.45. There are two degrees, first and second; the former, a class D felony; the latter, a class E felony. It becomes first degree abortion only after the female is more than 24 weeks into her pregnancy.

. Penal Law § 125.05 under the heading "definitions of terms”, subdivision (3), declares justifiable: (a) all therapeutic abortions, and (b) all within 24 weeks, performed with consent.

. See, L 1970, ch 127.

. In defendants’ responsive papers to this motion, they have urged the court to instruct the jury on the impact and meaning of President Regan’s "Personhood Proclamation” of January 14, 1988 (53 Fed Reg 1464), specifically, how under the Supremacy Clause it affects the justification of abortion under State penal laws. This court has held that the proclamation cannot repeal State penal laws, but that the jury may consider the proclamation in deciding whether abortion is an "injury to be avoided” under the justification defense.

. The court remarks, however, as to this latter argument, that under New York law, the prosecutor, in the exercise of his discretion, need not prosecute abortion protestors, and that if a prosecutor simply chose not to prosecute, this State action argument would fail.

. There are many such cases (e.g., People v Krizka, 92 Ill App 3d 288, 416 NE2d 36 [1980]; Sigma Reproductive Health Center v State, 297 Md 660, 467 A2d 483 [1983]; City of St. Louis v Klocker, 637 SW2d 174 [Mo Ct App 1982]; Commonwealth v Markum, 373 Pa Super 341, 541 A2d 347 [1988]; compare, Comment, The Necessity Defense in Abortion Clinic Trespass Cases, 32 St. Louis Univ LJ 523 [1988].

. 373 Pa Super 341, 541 A2d 347 (1988). For those who may consult this case as an authority on the provisions of the Model Code, it is important to note that each of the Judges who heard this appeal filed his own opinion, and that the dissenting opinion held that modern medical technology had made Roe’s trimester brackets obsolete, so that no court could confidently announce which abortions still retained constitutional protection.