## NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,

v.

## Russell TRAIN, Administrator Environmental Protection Agency, et al., Defendants.

### No. 74 Civ. 4617.

United States District Court, S. D. New York.

March 1, 1976.

---

David Schoenbrod, Natural Resources Defense Council, New York City, for plaintiff; Marcia Cleveland, New York City, of counsel.

John S. Siffert, Asst. U. S. Atty., New York City, for defendants; Leslie A. Carothers, Washington, D. C., for EPA; Paul Kaplow, Washington, D. C., Dept. of Justice, of counsel.

## MEMORANDUM

STEWART, District Judge:

Natural Resources Defense Council, Inc. ("NRDC") and other named plaintiffs bring this action against the Environmental Protection Agency ("EPA") and its administrator Russell Train for failure to list lead as a pollutant under § 108 of the Clean Air Act of 1970. Defendants have moved to dismiss the complaint for lack of jurisdiction and failure to state a claim or for an order granting summary judgment. Plaintiffs have also moved for summary judgment.

Plaintiffs have alleged four separate grounds upon which the court might find jurisdiction: 1) § 304 of the Clean Air Act, as amended, 42 U.S.C. §§ 1857h–2(a); 2) the Administrative Procedures Act, 5 U.S.C. §§ 701–706; 3) the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2; and 4) the mandamus provisions of 28 U.S.C. § 1361.

Section 304 of the Clean Air Act provides in pertinent part:

> Any person may commence a civil action on his own behalf (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

Defendants argue that the listing of pollutants under § 108 is a discretionary function and therefore no jurisdiction is vested in this court by virtue of § 304. While § 304 does not provide jurisdiction over distinctly discretionary functions of the Administrator, see e. g., *United States Steel Corp. v. Fri*, 364 F.Supp. 1013 (N.D.Ind.1973), it does permit jurisdiction to decide whether a function is mandatory or discretionary. *Cf. Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945).[1] We therefore do not

---

1. Plaintiffs essentially seek a writ of mandamus to compel performance of the alleged duty to list lead as a pollutant under § 108. Mandamus is an appropriate remedy under

need to consider plaintiffs' other asserted jurisdictional grounds.

We turn now to the merits of plaintiffs' claim. Section 108 provides that the Administrator shall publish, and from time to time revise, a list including each air pollutant

(A) which in his judgment has an adverse effect on public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

(C) for which . . . he plans to issue air quality criteria under this section.

Plaintiffs contend that the statutory language, legislative history and purpose, as well as current administrative interpretation of the 1970 Clean Air Act, all militate in favor of finding that the Administrator's function to list pollutants under § 108 is mandatory, once it is determined by the Administrator that a pollutant "has an adverse effect on public health or welfare" and comes from the requisite numerous or diverse sources. Defendants concede in this action that lead comes from the requisite sources and that the Administrator has found lead to have the required "adverse effect." Defendants argue, however, that the language of § 108(a)(1)(C) "for which . . . [the Administrator] plans to issue air quality criteria" is a separate and third criterion to be met before § 108 requires placing a pollutant on the list. This construction of § 108(a) leaves the initial decision to list a pollutant within the sole discretion of the Administrator. Defendants contend such discretion is required because the Administrator must choose between alternative

remedies provided in various sections of the Act and that any decision to utilize the remedies provided by §§ 108–110 "involves complex considerations." (Defendants' brief at 22).

■ Through analysis of the parties' arguments and of the various remedies and provisions of the Act, we have determined that the statutory scheme contemplates a mandatory duty on the part of the Administrator which is enforceable in the instant action.

Congress, in passing the Clean Air Act of 1970, was concerned with the delays and inefficiencies incurred in implementing the 1963 and 1967 air pollution acts. The House Report stated that "progress [had] been regrettably slow," citing "cumbersome and time-consuming procedures called for under the 1967 Act," "organizational problems on the federal level where air pollution control has not been accorded a sufficiently high priority" and "failure on the part of the National Air Pollution Control Administration to demonstrate sufficient aggressiveness in implementing present law." H.R.Rep. 91–1146, 91st Cong., 2d Sess. 5 (1970), U.S.Code Cong. & Admin.News, p. 5360. Thus, in the language of the 1970 Act, Congress attempts to achieve cleaner air by specifying procedures and timetables to be followed, all of which are reflective of Congress' determination "to speed up, expand, and intensify the war against air pollution in the United States." H.R.Rep. 91–1146, 91st Cong., 2d Sess. 1 (1970), U.S.Code Cong. & Admin.News, p. 5356.[2]

Defendants' main argument in support of its construction of the section as discretionary is that there are other sections within the Act which provide alternative remedies for lead pollution. The

§ 304 of the Clean Air Act to compel performance of a non-discretionary duty. *See NRDC v. EPA,* D.C. Cir. No. 72–2233 (1973); *Citizens Association of Georgetown v. Washington,* 370 F.Supp. 1101 (D.D.C.1974).

2. In this statutory scheme, the listing of a pollutant under § 108(a)(1) triggers the setting of air quality criteria within 12 months after that listing (§ 108(a)(2)) and compels issuance of

information about air pollution control techniques (§ 108(b)(1)) and establishment of national primary and secondary ambient air quality standards for each pollutant. (§ 109(a)(2)). Finally, within 9 months of the Administrator's setting the national ambient air quality standard, each state must submit a plan through which the state can meet that standard. (§ 110(a)).

existence of alternatives, defendants contend, requires that the Administrator should have the discretion to choose among the remedies provided by the Act.

In addition to the explicitly stated purpose of the Act, as outlined above, we do not think that the statutory language supports defendants' construction of the Act. There is no language anywhere in the statute which indicates that the Administrator has discretion to choose among the remedies which the Act provides. Rather, the language of § 108 indicates that upon certain enumerated conditions, one factual and one judgmental, the Administrator "shall" list a pollutant which triggers the remedial provisions of §§ 108–110. The statute does not provide, as defendants would have it, that the Administrator has authority to determine whether the statutory remedies which follow a § 108 listing are appropriate for a given pollutant.

■■■ We think the reasonable reading of the disputed language in § 108 is that the Administrator must include on the initial list to be issued 30 days after December 31, 1970, all those pollutants "for which air quality criteria had not been issued before [that date]" but which pollutants he has already found in his judgment to have an adverse effect on public health or welfare and to have come from the requisite sources.[3] The Senate Committee Report supports our reading of the language. The Report states that § 108 requires the initial list to "include all those pollution agents which have, or can be expected to have, an adverse effect on health and welfare and which are emitted from widely dis-

tributed mobile and stationary sources, and all those for which air quality criteria are planned." S.Rep.No.91–1196, 91st Cong., 2d Sess. 54 (1970). It is to the initial list alone that the phrase "but for which he plans to issue air quality criteria" is directed; the phrase cannot mean that the Administrator need not list pollutants which meet the two requisites clearly set forth in the section.[4] Again, that construction would comport with neither the clear legislative intent to have strict mandatory health procedures in effect by mid-1976 nor the language of the Act itself. While the Administrator is provided with much discretion to make the threshold determination of whether a pollutant has "an adverse effect on health," after that decision is made, and after it is determined that a pollutant comes from the necessary sources, there is no discretion provided by the statute not to list the pollutant. We think that Congress intended to trigger the elaborate procedures of §§ 108–110 whenever the above two factors were found to exist.

Although we have found no authority which has directly confronted this question, § 108 has been construed to require listing of all pollutants for which the two enumerated criteria have been met. That was the interpretation initially placed upon the section by the Administrator on January 30, 1971. 36 Fed.Reg. 1515 (1971). That is the same construction which has been placed upon the section by other courts in dicta. See Indiana & Michigan Electric Co. v. EPA, 509 F.2d 839, 841 (7th Cir. 1975); Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 462 F.2d 846, 847 (1972).

**3.** Our construction of the statutory language renders irrelevant arguments by both sides concerning the five pollutants which the senate subcommittee had examined. We do not think that Congress intended to bind the Administrator to list any particular pollutants but only to list those pollutants which met the two criteria established in the statute. Since the Administrator has either found that the other pollutants considered by Congress do not have an "adverse effect" or do not come from the requisite sources, those pollutants are not in

the same category with lead which concededly meets the two requirements of the section.

**4.** Further, we note that defendants' construction of § 108 would render the mandatory issuance of a list meaningless. Under defendants' construction of § 108, it might well be that the Administrator would choose not to list any pollutant at all, but would nevertheless be required by the legislation to issue a "list." We cannot find support for such a construction.

With specific reference to the lead pollution at issue here and in support of their position that the Administrator should have discretion under the Act to choose among remedies provided by various sections, defendants point us to the Administrator's decision to regulate lead in gasoline under § 211(c)(1) [42 U.S.C. § 1857f–6c(c)(1)].[5] Defendants assert that the EPA considered regulating lead pollution either by setting national ambient air standards under § 108 or by establishing standards for the lead content of motor vehicle gasoline under § 211.[6] However, as we read the two statutory sections, § 108 and § 211, they are neither mutually exclusive nor alternative provisions. Defendants' argument is premised upon the misconception, as discussed above, that the statutory scheme provides alternative remedies for pollutants. We think the misconception becomes clear through analysis of the specific case of lead pollution regulation.

■■■■ Defendants state the reasons for the Administrator's decision to regulate lead under § 211.

It was the Administrator's judgment that (a) uniform standards would make industry compliance simpler than a proliferation of differing state standards, (b) federal controls at the refinery level would be more efficient than state or local controls directed at thousands of distributors and retailers, and (c) the states were hard-pressed to implement the six existing ambient air quality standards and should not be assigned another major regulatory task when equally effective alternatives were available.

These reasons could have no bearing upon a policy decision, if one were permissible under the Act, of whether or not to establish national standards under § 108. The benefits of uniform standards, of federal controls and of averting "another major regulatory task" for the states can all accrue from regulations under § 211 when lead is listed under § 108. If the Administrator sets standards under § 211 which effectively decrease the level of lead in the ambient air by taking lead out of gasoline, then the decrease in pollution brought about by the § 211 regulations will be taken into account by each state when it submits its plan to meet the national standard set under § 110.[7] In fact, § 211(c)(4)(C) provides that the only circumstances under which the Administrator may approve the regulation of motor vehicle fuel or fuel additive in an implementation plan promulgated pursuant to § 108 is where "he finds that the State control or prohibition is necessary to achieve the national primary or secondary ambient air quality standard which the plan implements."[8] Therefore, if the Administrator had made the necessary regulations under § 211, he cannot

---

**5.** Section 211(c)(1) provides, in pertinent part, that

The Administrator may, from time to time . . . control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine (A) if any emission products of such fuel or fuel additive will endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

**6.** In fact, the Administrator did set regulations under § 211 for lead in gasoline which were

subsequently struck down by the Court of Appeals for the District of Columbia. A rehearing *en banc* was granted and the case is now *sub judice* before the full court. *Ethyl Corp. v. EPA*, 165 U.S.App.D.C. 282, 506 F.2d 1321, *reh. en banc* (1975).

**7.** Further, plaintiffs are correct in stating that no state controls are required where the ambient air standard is achieved through federal emission limitations under section 202 [42 U.S.C. § 1857f–1]. 40 CFR § 51.14.

**8.** We cannot agree with defendants' contention that § 211(c)(4)(C) "supports EPA's construction" of § 108. (Defendants' reply memorandum at 2). We do not think the cited section supports either parties' position with regard to the mandatory or discretionary language of § 108.

permit the states to regulate lead emissions through the implementation plans provided for in § 110. In the event that regulation under § 211 causes a decrease in air lead sufficient to meet any national standard set under § 108, then there will be uniform standards, federal regulation and no further regulatory task for the states. Despite regulation under § 211, however, the Administrator must nevertheless list lead as a pollutant since it concededly meets the two criteria of § 108 and must set in motion the collection of scientific data and the issuance of criteria and national standards. We believe it is necessary to "literally comply with all the formal steps provided by the statute" even if "the extent to which compliance with these requirements might produce beneficial results is not known." *NRDC v. EPA,* 154 U.S.App. D.C. 384, 475 F.2d 968, 972–3 (1973) (MacKinnon, J., concurring). One reason to enforce compliance is seen in the disagreement on the comparative rigors of the "adverse effect" standard in § 108 and the "will endanger" standard in § 211. The only agreement is that these two phrases represent different standards. *Ethyl Corp. v. EPA,* 165 U.S. App.D.C. 282, 506 F.2d 1321 *reh. en banc* (1975). It is conceivable, therefore, that regulation of lead under whichever one of these sections is characterized as less stringent would not be sufficient to meet the more rigorous standard of the other section. The acknowledged difference in the two standards is further support for our finding that these two provisions were not meant to be alternative remedies for pollutants.

 Finally, we turn to an additional argument of defendants that the Administrator needs discretion not to list lead under § 108 because the data which would be necessary to support an ambient air standard for lead is arguably lacking. Defendants concede, however,

that such a potential lack of data did not enter into the Administrator's decision not to list lead at the time it was made. We do not think that the potential lack of data would have been an appropriate consideration prior to listing a pollutant under § 108 in any event. Under the statutory scheme, the listing of a pollutant is no more than a threshold to the remedial provisions. Before a listing, the statute provides for the Administrator to exercise his judgment concerning whether or not a pollutant, here lead, has an adverse effect upon the public health. Once he has made that judgment, however, the Administrator does not have discretion not to list lead as a pollutant because necessary data—data other than that necessary to make the initial decision as to "adverse effect"—is unavailable. The statute appears to assume that, for each pollutant which must be listed, criteria and a national standard can be established. A twelve month period is provided for that purpose. However, Congress cannot require the impossible. It may be that a pollutant exists which meets the listing requirements of § 108 but for which no criteria or national standard is possible. That issue is not before this court.[9] The only question here is the threshold one of whether lead must be listed according to § 108 and we have determined that it must.

We cannot find support for defendants' position that there is "much to be lost by limiting EPA's ability to select from its sources of authority in the Clean Air Act the control strategy best suited to the pollution problem at hand." (Defendants' memorandum in support of motion to dismiss at pp. 20–21). We are convinced that the Administrator has considerable, and sufficient, discretion. Not only does he exercise his judgment over the initial determination of whether a pollutant "has an adverse effect upon health," but also he must set the national standard "which in [his] judgment

9. Congress did contemplate criteria might be set with which it would be technically unfeasible to comply. Section 110(e) provides for extensions in the time for compliance in such instances. *See NRDC v. EPA,* 154 U.S.App. D.C. 384, 475 F.2d 968 (1973). Congress did not provide, however, that criteria should not be set at all.

. . . is requisite to protect the public health." (§ 109(b)(1)). Finally, the Administrator must approve the implementation plans of the states. We think that these provisions give the Administrator all the discretion which Congress contemplated that he have.

In the instant case, the Administrator has conceded that, in his judgment, lead "has an adverse effect on health" and comes from "numerous or diverse mobile or stationary sources." The two statutory criteria having been met and this court having determined that a duty thereafter arises, it is

ORDERED that the Administrator place lead on the list of pollutants, in accordance with the mandate of § 108, within 30 days from the date of this decision.

SO ORDERED.