*853 OPINION OF THE COURT
Laura Safer-Espinoza, J.
Each of the defendants in this case is charged with disorderly conduct (Penal Law § 240.20 [5], [6]). These charges are a result of their participation in a demonstration organized by Transportation Alternatives on October 22, 1990, at the entrance to the south outer roadway of the Queensboro Bridge, in opposition to the opening to vehicular traffic of the one lane that had been reserved for bicycles and pedestrians, during evening rush hours.
Pursuant to an agreement with the Manhattan District Attorney’s office, defendants stipulated to the facts constituting the People’s direct case. In substance, they admitted their presence on the south outer roadway of the Queensboro Bridge at approximately 4:00 p.m. on October 22, 1990. They also admitted that at about 4:15 p.m., a New York City police officer ordered them to move, and that they did not comply with that order until they were placed under arrest, at which time they moved voluntarily and did not resist in any way.
In return for this stipulation, the prosecution agreed not to offer any objections to the presentation of a necessity defense by these defendants.
A nonjury trial was held before this court on February 5th and 6th, 1991. The People’s case consisted of the above-mentioned stipulation. Defendants presented their own testimony, as well as that of several witnesses, including Dr. Steven Markowitz, a specialist in community medicine with the Division of Environmental and Occupational Medicine at Mount Sinai Medical Center and former Commissioner of Transportation, Ross Sandler, as expert witnesses. Several exhibits consisting of Department of Transportation memos were then entered into evidence by the People as rebuttal.
THE NECESSITY DEFENSE AND CITIZEN INTERVENTION
The necessity defense is fundamentally a balancing test to determine whether a criminal act was committed to prevent a greater harm. The common elements of the defense found in virtually all common-law and statutory definitions include the following: (1) the actor has acted to avoid a grave harm, not of his own making; (2) there are not adequate legal means to avoid the harm; and (3) the harm sought to be avoided is greater than that committed. A number of jurisdictions, New York among them, have included two additional requirements —first, the harm must be imminent, and second, the action *854 taken must be reasonably expected to avert the impending danger.
Extensive research revealed that while Judges in New York (with one partial exception, discussed infra) have so far declined to rule that a necessity defense has been sufficiently established to allow the trier of fact to consider it in their deliberations in cases involving defendants who have engaged in citizen intervention/civil disobedience, numerous State Trial Judges in other jurisdictions, as well as some Federal District Court Judges, have so charged juries or acquitted defendants after bench trials in similar cases.
Moreover, when the necessity defense is actually submitted to the trier of fact in such cases, defendants have usually been acquitted (see, e.g., United States v La Forge, No. Cr 4-84-66 [US Dist Ct, Minn, Nov. 8, 1984]; People v Brown, No. 78CM2520-40 [Lake City, Ill, Jan. 1979]; California v Mc Millan [San Luis Obispo Jud Dist, No. D00518, 1988]. Other citations omitted for purposes of publication). There are also a number of cases in which charges were dropped after the Judge’s rulings that a necessity defense would be permitted (see, e.g., United States v Braden, PL-139/20 [WD Ky 1985]; New Jersey v Driscoll, PL-172/50 [Mun Ct, New Brunswick, No. S5484432, 1986]. Other citations omitted for purposes of publication). While far from an exhaustive listing, these cases are representative of the range of perceived harms against which defendants’ actions have been found to be justified; including the effects of nuclear weapons and nuclear power.
In the opinion of this court, the instant case presents a factual situation which clearly distinguishes it from previous cases in New York which ruled a necessity defense inapplicable. Additionally, upon careful examination of the history and purpose of the justification defense which has come to be known as necessity, this court has interpreted some of the elements of this defense in a manner which departs from prior decisions in this area.
HISTORY OF THE NECESSITY DEFENSE
[This discussion has been omitted for purposes of publication].
BURDENS OF PROOF IN NECESSITY DEFENSE CASES UNDER PENAL LAW § 35.05 (2)
Justification in New York, as defined in Penal Law §§ 35.05 *855 through 35.30 is an ordinary and not an affirmative defense (Penal Law § 35.00). Thus, the People have the burden of disproving such a defense beyond a reasonable doubt. Penal Law § 35.05 (2) requires, however, that a defendant establish a prima facie case by producing evidence from which a reasonable juror could find that he has met each element of the defense.
Therefore, when seeking to establish a defense under Penal Law § 35.05 (2), a defendant bears the same initial burden as those presenting affirmative defenses — that of establishing a prima facie case (29 Am Jur 2d, Evidence, § 156 [1967]). If that burden is met, the People must then disprove the defense of necessity beyond a reasonable doubt. Unlike true affirmative defenses, defendants in cases under Penal Law § 35.05 (2) do not have the burden of establishing their defense by a preponderance of the evidence.
It is particularly important to clearly delineate and evaluate whether defendants have met their initial burden of production in trials involving the necessity defense, since if that question is resolved in a defendant’s favor, the burden of proof then shifts dramatically, and the People must disprove the defense beyond a reasonable doubt. This is true whether the trier of fact is a jury or a Judge.
As to the burden of production in affirmative defenses, it is uniformly held that a defendant is obliged to start matters off by putting in some evidence of his defense unless the prosecution does so in presenting its side (1 LaFave & Scott, Substantive Criminal Law § 1.8).
Our courts have held that in determining whether a defendant has presented sufficient evidence for an instruction on the defense of justification, the evidence must be viewed in the light most favorable to the accused (People v Padgett, 60 NY2d 142 [1983]; People v Ruiz, 96 AD2d 845 [2d Dept 1983]).
It is the duty of the Judge, at least on request, to instruct on the law of justification whenever there is "some evidence” in the case (People v Torre, 42 NY2d 1036; People v Hernandez, 67 AD2d 988 [2d Dept 1979]).
In light of the strong constitutional considerations in favor of allowing defendants to have their defenses submitted to the trier of fact, the discrepancy between the low standard of production which some courts have articulated in theory (United States v Bailey, 444 US 394 [1980] [must meet "mini *856 mum standard”]; People v Hubbard, 115 Mich App 73, 230 NW2d 294 [1982] [must produce "some evidence”]), and the extraordinarily high standard ultimately imposed in many instances on civil disobedients who raise the necessity defense seems inappropriate.
THE REASONABLE BELIEF STANDARD
In People v Goetz (68 NY2d 96 [1986]), the New York Court of Appeals emphasized that the justification statute requires a determination of reasonableness that is both subjective and objective. The critical focus must be placed on the particular defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant’s background and experiences would conclude (see, 1 CJI[NY] PL 35.00, Introductory Comment, at 848-849). The same basic standards should apply in cases where defendants assert the justification defense defined by Penal Law § 35.05 (2).
There is only one element of the necessity defense to which a standard more stringent than reasonable belief must be applied — that is the actor’s choice of values, for which he is strictly liable.
An actor is not justified, for example, in taking human life to save imperiled property. No matter how real the threat to property is, by making the wrong choice in placing the value of property over human life, the actor loses the defense. Thus, the choice of values requirement ensures that the defense cannot be used to challenge shared societal values.
To apply a strict liability standard in evaluating the other elements of this defense, however, and to find that only actors who have actually averted a greater harm may avail themselves of the defense, is inconsistent with the law of justification in New York, as well as necessity’s basic purpose to promote societal interests. (Note, Applying the Necessity Defense to Civil Disobedience Cases, 64 NYU L Rev 78 [1989].) Applying the above standards, the court will now analyze the elements of the necessity defense as they apply to defendants’ actions in this case.
THE CHOICE OF EVILS REQUIREMENT
As stated earlier, defendants’ value choice is the one area where they must be held strictly liable. A Judge must decide *857 whether the actor’s values are so antithetical to shared social values as to bar the defense as a matter of law.
As part of this objective inquiry, the requirement that a Judge also determine whether or not the defendant’s value choice has been preempted by the Legislature has sometimes been read into the statute. New York specifically declined to adopt the broad provision of the Model Penal Code section dealing with legislative preemption in necessity cases (see, Model Penal Code §3.02 [1] [c] ["a legislative purpose to exclude the justification claimed does not otherwise plainly appear”]) and instead provided that defendants must not be protesting only against the morality and advisability of the statute under which they are charged.
A reading of the cases in this area reveals that it is seldom the correctness of defendants’ values which is at issue. Courts have generally recognized that the harms perceived by activists protesting nuclear weapons and power and United States domestic and foreign policy — nuclear holocaust, international law violations, torture, murder, the unnecessary deaths of United States citizens as a result of environmental hazards and disease — are far greater than those created by a trespass or disorderly conduct. (People v Chachere, 104 Misc 2d 521 [1980]; People v Scutari, 148 Misc 2d 440 [1990]; People v Alderson, 144 Misc 2d 133 [1989].)
In this case, the defendants are all members of an organization called Transportation Alternatives, an organization devoted to the promotion of nonvehicular, ecologically sound means of transportation. Through their testimony and that of their expert witnesses, it was clear that these defendants’ actions were motivated by the desire to prevent what they called the "asphyxiation of New York” by automobile-related pollution. Specifically, the harm they seek to combat is the release of ever higher levels of pollution from vehicular traffic, and the unnecessary death and serious illness of many New Yorkers as a result.
Defendants also articulated a motivation to put an end to an extremely hazardous situation that had resulted on the Queensboro Bridge south outer roadway, subsequent to the implementation of the regulation opening that roadway to vehicular traffic during the evening rush hour. Since many pedestrians and bicyclists continued to use that roadway, the defendants testified that they also acted to prevent serious injuries to those individuals who continued to use alternative forms of transportation on the bridge.
*858 Certainly, neither of these harms could be said to have developed through any fault of these defendants. Nor is there an issue of legislative preemption in this case.[1] In fact, in a departure from the usual situation in citizen intervention cases, it is clear that it is the defendants’ point of view concerning air pollution and its accompanying dangers that has been confirmed and adopted by the Legislature.[2]
Nor is this a case where the defendants are acting against what the courts have already recognized as a fundamental right, as in the abortion protests which have asserted a necessity defense. There is no corresponding fundamental right to contribute to life threatening air pollution. (People v Crowley, 142 Misc 2d 663 [Justice Ct, Town of Greece 1989]; People v Archer, 143 Misc 2d 390 [Rochester City Ct 1988].) In Archer, the court submitted the necessity defense to the jury, to be considered if they found second trimester abortions were being performed. The court failed to recognize the protections extended to such procedures under Roe v Wade (410 US 113 [1973]). Defendants in that case were convicted.
*859 In this case, as well as in most necessity cases, it is clear that defendants chose the correct societal value. It is beyond question that both the death and illness of New Yorkers as a result of additional air pollution, and the danger to cyclists and pedestrians posed by vehicles on the south outer roadway, are far greater harms than that created by the violation of disorderly conduct.
The more difficult issue in many of the necessity defense cases has been whether the actors’ perception of harm was reasonable. The court will now turn to a discussion of this requirement, and the additional requirement of Penal Law § 35.05, that the harm be imminent.
THE IMMINENCE OF GRAVE HARM REQUIREMENT
In evaluating whether defendants’ perceptions of the harm they sought to avoid in this case were reasonable, the court must decide whether they had a well-founded belief in imminent grave injury. (United States v Ashton, 24 F Cas 873 [CC Mass 1834] [No. 14,470]; accord, United States v Cassidy, 616 F2d 101, 102 [4th Cir 1979]; State v Heyer, Nos. 83-101221 — 83-101225, slip opn, at 3, Mich Dist Ct, Apr. 9, 1984 [order permitting necessity defense].)
Such determination is almost always a question for the trier of fact (State v Heyer, Dist Ct, Oakland County, 52d Dist, 1st Div, Nos. 83-101194 — 101228 [1985]; People v Jones, Nos. 83-101226 — 83-101228, slip opn, at 4-5, Mich Dist Ct, Mar. 2, 1984 [opinion and ruling denying prosecutor’s motion to exclude defense of duress]).
Defendants in the instant case presented several witnesses, as well as submitting studies, to establish the existence of a grave and imminent harm. Defendants themselves testified that the DOT regulation, if obeyed, would prove to be a devastating disincentive to New Yorkers who use alternative or nonvehicular means of transportation between the Boroughs of Manhattan and Queens. The only road open to bicyclists and pedestrians is practically inaccessible to them during the hours most critical to their return home. In contrast to this disincentive to nonpolluting forms of transportation, another lane is open to vehicular traffic.
Defendants clearly articulated their belief that encouraging automobiles at a rush hour traffic "choke-point” while discouraging walkers and cyclists produces a specific, grave harm that is not only imminent, but is occurring daily. This belief *860 was supported by the testimony of expert witnesses and studies submitted into evidence.
Former Commissioner of Transportation Sandler gave undisputed testimony that New York City would have to reduce vehicular traffic in order to come into compliance with the minimum standards set by the Environmental Protection Agency for air pollution. Indeed, recent litigation corroborates defendants’ claim that New York’s failure to comply with EPA standards is due, in substantial measure, to automobile-related pollution. (Natural Resources Defense Council v New York State Dept. of Envtl. Conservation, 668 F Supp 848 [SD NY 1987].)
Additionally, Dr. Steven Markowitz of the Mount Sinai Department on Environmental and Occupational Diseases testified that air pollution in New York and elsewhere is a major cause of lung, respiratory tract and heart disease. He particularly singled out carbon monoxide and nitrogen oxide as disease-causing agents.

In this regard, EPA’s 1989 assessment concluded that motor vehicles were the single largest contributor to cancer risks from exposure to air toxics. Motor vehicles, said the EPA, are responsible for 55% of the total cancer incidence from air contaminants, five times greater than from any other air pollution source.

In the EPA survey, motor vehicle particulates accounted for more than 76% of the benzene, 63% of the directly emitted formaldehyde, and 77% of all polycyclic organic matter found in urban air. In addition, the average automobile (traveling 10,000 miles) emits about 650 pounds of carbon monoxide, 105 pounds of hydrocarbons, 50 pounds of nitrogen oxides, and 12 pounds of particulates into the air each year. A single tank of gasoline produces about 300 to 400 pounds of carbon dioxide when burned. According to State data the peak eight-hour concentration of carbon monoxide in 1988 recorded at 59th Street between Third Avenue and Lexington — the approach to the Queensboro Bridge — was 13.9 parts per million, far exceeding the national standard. (American Lung Assn. v New York State Dept. of Envtl. Conservation, 668 F Supp 848 [SD NY 1987]; Natural Resources Defense Council v Train, 411 F Supp 864 [SD NY 1976]; Natural Resources Defense Council v United States Envtl. Protection Agency, 494 F2d 519 [2d Cir 1974], supra; Friends of the Earth v Carey, 535 F2d 165 [2d Cir 1976]; New York City Department of Transportation study, *861 Improving Manhattan Traffic and Air Quality Conditions— Effectiveness of Bicycle Programs [1990].)
The above-cited DOT study also acknowledges that bicycle riding has a significant and untapped potential to reduce traffic congestion and its accompanying air pollution. It indicates that the numbers of people who would adopt this form of transportation if encouraged by simple safety measures including bicycle lanes on the part of New York City (almost 30% of those surveyed) is impressive. It states that the current level of bicycle rider ship in New York City is indicative only of those individuals who are so dedicated to cycling that they are willing to utilize a transportation system that has been shaped for decades without provisions for bicycles.
Defendant Komanoff pointed out that the over-all figure of 30% cited by the survey did not accurately reflect the potential for cycling as an alternative to polluting forms of transportation since 70% of the respondents lived over 10 miles from their workplace. Among those who lived within 10 miles of their workplace, 49% replied that they would ride bicycles to work if some provisions were made for their safety and comfort.
Dr. Markowitz testified that every increment in pollution makes a difference in terms of its negative impact on public health. He testified that the inverse is also true, i.e., every decrease in New York air pollution has a corresponding positive effect.
Defendants pointed out in their testimony that the need for repairs on the Queensboro Bridge provided a perfect opportunity to encourage walking and cycling as alternative forms of transportation, as well as a disincentive for automobile traffic. In fact, the demonstrations held by these defendants on a weekly basis prior to the date of the arrest in this case provided dramatic examples of the increased numbers of people who would use alternative forms of transportation if their safety was insured.
Instead, as the situation now exists, an additional lane is open to vehicular traffic, with each additional car causing the types and amounts of pollution described above, and a tremendous disincentive has been imposed upon those who use alternative forms of transportation.
Defendants repeatedly expressed their belief that those who use bicycles or who walk are now placed in the following dilemma: they can obey the ordinance and use forms of *862 transportation which further contribute to pollution, or they can disobey and be subject to the extremely hazardous conditions caused by riding with the traffic on the south outer roadway.
Unlike many of the cases in this area, where the harm sought to be prevented was perceived as too far in the future to be found "imminent”, the grave harm in this case is occurring every day. The additional pollution breathed by all New Yorkers (in a city that is already out of compliance with the minimal standards set by the EPA), as a result of the fact that more road space will be devoted to vehicles and its corollary that those hundreds of individuals who would otherwise bicycle or walk are discouraged from using nonpolluting forms of transportation is a concrete harm being suffered by the population at this moment.
The dangerous situation of cyclists and pedestrians traveling at the same hours as vehicular traffic is also a daily occurrence witnessed by several of these defendants. Defendants and their witnesses testified to their observations and documentation of the fact that many cyclists and pedestrians continue to use the south outer roadway, despite the DOT regulation. While the presence of cyclists and pedestrians on the day of the demonstration may be said to have presented a danger of the defendants’ own making, on all of the other occasions testified to, many individuals using alternative forms of transportation were present on the bridge at no instigation from these defendants. It is undisputed that the resulting mixture of automobiles, bicycles and pedestrians represents an extremely dangerous situation with the potential for tragic consequences.
Defendants’ witnesses also testified that due to the opening of the south outer roadway to vehicles during the rush hour, vehicles often assume it is open to them at other times as well. Their entry onto this roadway during nonrush hours also creates a serious hazard for walkers and cyclists.
These facts clearly distinguish the instant case from those situations where the courts have found the harm in question to be too remote (see, People v Chachere, 104 Misc 2d 521 [1980]; People v O’Grady, 147 Misc 2d 118 [1990], lv denied 76 NY2d 942 [1990]; People v Alderson, 144 Misc 2d 133 [1989], supra).
In light of all the evidence of grave and imminent harm cited by these defendants, the court finds that it would be *863 improper to hold as a matter of law that they had not met their burden of production on this element of the defense, i.e., that no reasonable juror could find that defendants had a reasonable belief that grave and imminent harm was occurring. The inquiry therefore becomes whether the People have disproved this element beyond a reasonable doubt.
The prosecution contends that no evidence was shown that barring bicycles and pedestrians from the south outer roadway of the Queensboro Bridge would cause increased pollution. It is argued that this roadway will only be closed "temporarily” during repairs and that opening the former bicycle and walking lane will decrease traffic congestion, thereby lessening pollution. The People also argue that no decrease in alternative forms of transportation need occur, since there is a van which is provided to shuttle cyclists periodically across the bridge during rush hours.
In response defendants testified that their consultations with the Department of Transportation revealed an intention to keep the bicycle and pedestrian lane closed during the evening rush hour for a period of six or seven years, if repairs are made on schedule. This can hardly be viewed as a temporary measure.
Furthermore, former Commissioner of Transportation Sandler testified that the net effect of giving vehicles more space to travel, which has been the constant trend over the last 50 years in New York, has not resulted in an increase in average automobile speed which would decrease pollution, but rather in more cars going at a decreased rate of speed.
In addition, defendants testified that the van proposed as an alternative for walking and cycling is, in itself, a great disincentive to nonpolluting forms of travel. First of all, forcing people who cycle and/or walk because of their deep commitment to ecologically sound means of transportation to use a pollution-causing vehicle every day directly negates their incentive to walk or cycle one way.
As people who are thoroughly familiar with the area of alternative means of transportation and those who use them in New York, defendants testified that in their opinion, significant numbers of people have already been discouraged from walking and cycling. In addition to their daily contacts and communication with cyclists and walkers, defendants cited the hundreds of people who joined them on their weekly demonstrations, and who expressed their enthusiasm for alternative *864 transportation when it was made safe enough, but refrain from walking or cycling at other times.
Additionally, several witnesses testified that the designated waiting area for the van is isolated and dark, making them fearful for their safety. The waiting time can be up to 40 minutes, and the scheduling is irregular. Furthermore, defendants documented by their own counts on the bridge that were all cyclists to use the van, the waiting time would stretch into hours. All witnesses familiar with the van testified that they had heard drivers tell pedestrians that the van was not available to them and saw pedestrians actually being barred from the vans on many occasions. No alternative whatsoever is provided for people who wish to walk to and from work.
This court also rejects the contention that proof of the imminent death of New Yorkers as a result of high levels of air pollution or accidents on the south outer roadway is required before the finding of an emergency can be made to uphold this defense. The medical evidence connecting air pollution and disease — namely, cancer and heart disease — is too well established for such a position to be logical. Nor should cyclists or walkers be at the point of being struck by a vehicle before a hazardous situation can be recognized. Indeed, to require that the ultimate result of the harm acted against be already occurring would place the actor in a Catch-22 situation; the longer the actor waits in order to satisfy the immediacy requirement, the less likely his action reasonably can be expected to effectively avert the harm, thus failing to satisfy another element of the defense.
In recent cases, it has become evident that the lesser evil sometimes must occur well in advance of the greater harm. In People v Harmon (53 Mich App 482, 220 NW2d 212 [1974]), the defendants escaped from prison one evening after threat of assault, although there was no present or impending assault. The court ruled that imminency is "to be decided by the trier of fact taking into consideration all the surrounding circumstances, including defendant’s opportunity and ability to avoid the feared harm.” (People v Harmon, supra, at 484, at 214.)
In this case, the threatened harm of increased deaths and illness through air pollution is a uniquely modern horror, very different from the fires, floods and famines which triggered necessity situations in simpler days. However, the potential injury is just as great, if not greater.
*865 This court is painfully aware that once individuals succumb to the diseases listed by Dr. Markowitz — chronic lung disease, cancer of the lung, and heart disease — the time for any action to prevent the environmental causes of these illnesses is long past. Due, in part, to our failure to recognize high air pollution levels as an emergency despite its well-documented connection to many of our fatal and incurable illnesses, individuals are then cast into a frantic and lonely search for extremely costly and difficult therapies whose effectiveness is acknowledged as limited in a majority of cases.
Defendant Komanoff, who as an energy consultant has given expert testimony before municipal and State agencies in 20 States, four United States congressional committees, the Nuclear Regulatory Commission, State and public utility corporations and the Select Committee on Energy of the House of Commons in the United Kingdom, as well as serving as a consultant to Fortune 500 companies and the United States Congress on energy-related matters, and publishing op ed articles in newspapers throughout this country, expressed his opinion that the reasons the current state of health-impairing pollution is not publicly recognized as an emergency are rooted in societal "automobile dependency”.
Mr. Komanoff stated that 60% of petroleum needs in the United States are generated by the demands of automobiles. He cited the fact that the United States is the biggest world importer of petroleum and testified to his opinion that automobile dependence was responsible for what he called the "distortion of U.S. economic and foreign policy.”
Whether one agrees with Mr. KomanofFs statements or not, it is clear that they do offer one explanation for the lack of a more widespread recognition that an emergency exists, despite the clear evidence of life threatening damage caused by air pollution.
Pursuant to the foregoing discussion, this court finds the prosecution has failed to disprove the element that defendants in this case had a reasonable belief in a grave and imminent harm constituting an emergency, beyond a reasonable doubt.
THE NO LEGAL ALTERNATIVE REQUIREMENT
A key requirement of the necessity defense is that no reasonable legal option exists for averting the harm. Once again, the proper inquiry here is whether the defendant reasonably believed that there was no legal alternative to his *866 actions. The defense does not legalize lawlessness; rather it permits courts to distinguish between necessary and unnecessary illegal acts in order to provide an essential safety valve to law enforcement in a democratic society.
It has been asserted that because a democracy creates legal avenues of protest, alternatives must always exist. In the opinion of this court, however, to dispense with the necessity defense by assuming that people always have access to effective legal means of protest circumvents the purpose of the defense.
When courts rule as a matter of law that defendants always have a reasonable belief in other adequate alternatives, they are asserting that regardless of how diligent a party is in pursuing alternatives, no matter how much time has been spent in legitimate efforts to prevent the harm, no matter how ineffective previous measures have been to handle the emergency, the courts in hindsight can always find just one more alternative that a citizen could have tried before acting out of necessity.
Defendants in this case testified to a long history of attempts to prevent the harm they perceived. Although Transportation Alternatives is a group that is regularly consulted by the Department of Transportation and meets often with agency officials to propose measures to encourage walking, cycling and the use of mass transit, and to relieve traffic congestion with its accompanying pollution, they received no advance warning that the closing of the bicycle and pedestrian lane on the Queensboro Bridge was being considered.
Upon learning of this decision, the executive director of Transportation Alternatives contacted officials in the Department of Transportation and learned that no written notice had been made to any public interest group, nor were any hearings held before this regulation was passed.
Transportation Alternatives, through its director and its individual members (including these defendants), made formal written protest to Department of Transportation officials and other elected officials, such as the Manhattan Borough President and members of the City Council.
Transportation Alternatives also distributed newsletters to at least 12,000 people, urging them to write and/or call the elected officials involved. The six defendants on trial were personally responsible for hundreds of letters and phone calls, to Department of Transportation officials and elected officials. *867 They testified that these same efforts were made by hundreds of other Transportation Alternatives members.
These defendants also participated in Transportation Alternatives’ concerted petitioning and leafletting campaign, beginning on the first day of the bridge closing. The goal of all of the efforts by members of Transportation Alternatives was to obtain the DOT’s consent to a trial period of leaving the south outer roadway open to pedestrians and cyclists, and monitoring the resulting traffic conditions. The arguments put forward in their letters, petitions and calls included pointing out that this was a perfect opportunity to observe the results of a disincentive for vehicular travel, instead of penalizing those who utilized ecologically sound means of transportation.
Transportation Alternatives took the position that if they could obtain a public hearing on the issue of why the south outer roadway should not be closed to walkers and cyclists, they would end their protests. When no movement whatsoever resulted on the issue of public hearing, weekly demonstrations were held which involved walking and cycling across the south outer roadway. At all times Transportation Alternatives made it known that these demonstrations would cease if a public hearing was held.
Certainly, the efforts testified to by these defendants distinguish them from other cases in New York where the necessity defense has been found inapplicable (People v Alderson, 144 Misc 2d 133 [1989], supra).
Although there is no clear rule as to what facts are required to support a defendant’s burden to present evidence so that a trier of fact could find that he reasonably believed no alternative existed, some recent cases seem to indicate the appropriate level of inquiry.
In State v Keller (No. 1372-4-84, Vt Dist Ct, Nov. 17, 1984), the defendants successfully asserted that they conducted a sit-in at Senator Stafford’s office after "attempting in every reasonable manner to communicate with him”.
In People v Largrou (Nos. 85-000098 — 85-000100, Mich Dist Ct, Mar. 22, 1985), involving protests of nuclear weapons, the court was convinced by the defendants’ arguments that methods other than trespass were ineffective: "There are some who say that there is absolutely no prospect of the administration or the Congress to bring this matter to a successful conclusion and that the track record proves it and that the only possibility, however remote, the only possibility of survival lies in *868 protest. If people believe that, who can say they are wrong?” (Transcript of Judge’s order, People v Largrou, supra, at 10-11.)
In People v Block (Crim Nos. 3235-3245, Cal Sacramento County Mun Ct, Aug. 1979) defendant’s offer of proof of a long history of activism convinced the Judge to instruct on the necessity defense, and the jury to acquit based upon those instructions. Similarly, in People v Lemnitzer (No. 27106E, Pleasanton-Livermore Jud Dist, Alameda County Mun Ct, 1982), People v Alridge (No. 49091, Sunnyvale-Cupertino Jud Dist, Santa Clara County Mun Ct, May 21-23, 1979), People v Jarka (Nos. 002170, 002196-212,00214, 002236-002238, Cir Ct, Lake City, 111, Apr. 1985), Chicago v Streeter (Nos. 85-108644, 48, 49, 51, 52, 120323, 26, 27, Cir Ct, Cook City, Ill, May 1985), United States v La Forge (No. Cr 4-84-66, US Dist Ct, Minn, Nov. 8, 1984, supra), and People v Boelcke (No. 101194-101203, 52d Jud Dist, Jan. 7-12, 1985), defendants won instructions on the necessity defense after testifying to their history of attempting to affect change through legal means.
Consistent with the level of inquiry in these cases, the court in United States v Gant (691 F2d 1159 [5th Cir 1982]) stated that a history of futile attempts by others will meet the no-legal alternative requirement, but that a single instance of delayed police response did not necessitate the defendant’s taking the law into his own hands. The defendants in this case were certainly aware of the long history of litigation by citizens groups in efforts to enforce compliance with the Clean Air Act in New York.
In this case, the defendants were individuals who were thoroughly familiar with the process by which decisions concerning transportation in New York are made, and who, despite their long history of an advocacy and consultative role in such matters, were completely excluded from the decision-making process concerning the closing of a very important roadway for nonpolluting forms of transportation. Where, at the first opportunity, every traditional method of petitioning, letter writing, phone calling, leafletting and lobbying was vigorously pursued by these defendants to no avail, it cannot be said as a matter of law that they did not reasonably believe their legal alternatives to be exhausted.
The prosecution cross-examined the defendants concerning their failure to carry out an advertising campaign, a tactic they admitted was beyond their economic means.
*869 Defendants were also cross-examined as to why they did not demonstrate in a location other than the Queensboro Bridge.
In light of the fact that the demonstrations preceding October 22, 1990 did not include demonstrators refusing to move, and the goal of preventing the harm reasonably perceived by these defendants had not yet been achieved, the deescalation in tactics suggested by the prosecution would certainly not have appeared to be an alternative with any reasonable likelihood of efficacy.
Therefore, in the opinion of this court, the People have not disproven this element of the necessity defense, requiring defendants to have a reasonable belief that no further legal alternatives were available to them, beyond a reasonable doubt.
THE CAUSAL RELATIONSHIP REQUIREMENT
New York is among the jurisdictions that require a defendant’s actions to be reasonably designed to actually prevent the threatened greater harm. (People v Chachere, 104 Misc 2d 521, supra; People v Alderson, 144 Misc 2d 133, supra; People v Scutari, 148 Misc 2d 440 [1990], supra; People v O’Grady, 147 Misc 2d 118, supra.)
The People argue that defendants could not have reasonably believed that their actions on October 22, 1990 would bring about a halt to the harms they perceived.
An inflexible test allowing for no inquiry into the circumstances and events surrounding the formulation of a defendant’s belief, while imposing an after-the-fact requirement of an immediate relationship, constitutes a rule of per se unreasonableness, whereby a defendant who fails is held as a matter of law not to have reasonably believed in the efficacy of his action.
As with the other elements of this defense, the test consistent with the purposes of this defense is one of reasonable belief. Defendants’ initial burden is to offer sufficient evidence of a reasonable belief in a causal link between their behavior and ending the perceived harm.
The New York statute and most common-law formulations use the term "necessary” rather than "sufficient”. In the opinion of this court, a defendant’s reasonable belief must be in the necessity of his action to avoid the injury. The law does not require certainty of success.
*870 In several cases, defendants have successfully met the minimum standards of production in this area through reference to the historical effectiveness of such tactics (People v Block, Crim Nos. 3235-3245, Cal Sacramento County Mun Ct, filed Dec. 13, 1979).
While this court agrees that there are numerous examples in United States history which support the reasonable belief of a causal connection between citizen intervention and the prevention of harm, the defendants in this case need not go beyond their own experiences.
Defendants testified that they had participated in two short-term campaigns in the recent past which only became successful when civil disobedience was employed. One of these campaigns resulted in the defeat of Mayor Koch’s attempt in 1987 to ban bicycles from Manhattan streets. The second involved their attempts during the 1980’s to obtain access to a roadway along the river in New Jersey for cyclists and walkers. All efforts at letter writing and petitioning had been rebuffed, and it was only after members of Transportation Alternatives were arrested for acts of civil disobedience that a three-month trial period of access to the roadway for walkers and cyclists was instituted. This experiment was so successful that the officials involved thanked and commended Transportation Alternatives for their insistence and the arrangement was made permanent.
In each of these cited examples, members of Transportation Alternatives participated in civil disobedience/citizen intervention which proved to be the last step needed to avert the harms acted against.
Each defendant testified that they believed their actions on October 22, 1990 would have a direct effect in avoiding the perceived harms in this case. In light of their past experiences, that belief cannot be held unreasonable as a matter of law.
Neither through cross-examination nor independent evidence did the People disprove a reasonable belief by these defendants that their actions on October 22, 1990 were necessary, or that those actions were, in fact, the last effort needed to halt those harms. Penalizing them because a result reasonably expected did not actually occur immediately following their action, would be contrary to the purposes of the necessity defense.
*871 Pursuant to the foregoing opinion, this court finds that the People have not disproved the elements of the necessity defense in this case beyond a reasonable doubt. Defendants are therefore acquitted.
[Portions of opinion omitted for purposes of publication.]

. Certainly, the regulation by the Department of Transportation concerning the Queensboro Bridge cannot be cited as legislative preemption in this case. First, the doctrine simply does not apply to executive or agency action. Moreover, the circumstances under which this regulation was passed preclude any argument that a full discussion and resolution of the competing values at stake was undertaken by the Department of Transportation (see, infra).

. As testified to by the former Commissioner of Transportation, Ross Sandler, the Clean Air Act Amendments of 1970 (42 USC §§ 7401-7642, as amended) required the Environmental Protection Agency (EPA) to promulgate "clean air” standards. New York is not now, and has never been, in compliance with those minimum standards set by the EPA. This noncompliance has been the cause of numerous citizen suits seeking enforcement of pollution level standards in New York City. (Natural Resources Defense Council v United States Envtl. Protection Agency, 494 F2d 519 [2d Cir 1974]; Friends of the Earth v Carey, 422 F Supp 638 [SD NY 1976], vacated 552 F2d 25, on remand 76 FRD 33, cert denied 434 US 902; Beame v Friends of the Earth, 434 US 1310 [1977].)
Broad legislative preferences such as that expressed by the Clean Air Act, have often been used in the reverse situation by the courts to ban the necessity defense on grounds of legislative preemption. This is particularly true in a number of cases where courts have implied a legislative choice in favor of nuclear power and weaponry (United States v Best, 476 F Supp 34, 41 [D Colo 1979]; People v Hubbard, 115 Mich App 73, 230 NW2d 294 [1982], supra; State v Warshow, 138 Vt 22, 410 A2d 1000 [1979]; People v Eisenberg, App Term, No. 7R005336 et seq. [1988]; People v Chachere, 104 Misc 2d 521 [1980], supra). Other courts have required that the Legislature have specifically weighed competing harms, including those foreseen by defendants, and made a value choice rejecting defendant’s position.